# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

ALLERGAN, INC.,

                Plaintiff,

         v.

MERZ PHARMACEUTICALS, LLC, et al.,

              Defendants.

_____

MERZ PHARMACEUTICALS, LLC, et al.,

            Counterclaimants,

         v.

ALLERGAN, INC.

            Counter-Defendant.

_____

CASE NO. SACV 11-446 AG (Ex)

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

This case is about misappropriation of trade secrets.  In August 2010, Plaintiff and Counter-Defendant Allergan, Inc. ("Allergan") sued Defendant and Counterclaimants Merz Pharmaceuticals, LLC ("Merz Pharma") and Merz Aesthetics, Inc. ("Merz Aesthetics") (collectively, "Merz Defendants") and Erin Sullivan, Sheri Tremmel, Amber Prumer, Jacqueline Luby, Amy F. Finn, Jeffrey Riordan, and Timothy D. Byrns (collectively, "Individual Defendants") for misappropriating its trade secrets, among other things.  After reviewing the evidence presented during a nine-day bench trial and evaluating the credibility of this evidence and the witnesses, the Court supplements its oral Findings of Fact and Conclusions of Law with the following.

## FINDINGS OF FACT

After reviewing and evaluating all evidence presented by the parties, the Court makes the following findings of fact, including any findings of fact found in the Conclusions of Law.  The findings of fact are based largely on an evaluation of the credibility of witnesses at trial.

1.    Allergan is a specialty health care company that produces and sells Botox, a prescription medicine used to treat cervical dystonia and blepharospasm, as well as four other medical indications.  Allergan also produces and sells Botox Cosmetic, a prescription medicine that is injected into muscles and used to improve temporarily the look of glabellar lines, and Juvederm, a dermal filler that is injected into the skin to correct severe facial wrinkles and folds.

2.    Merz Aesthetics is a health care company that, until February 2010, was known as BioForm Medical, Inc. ("BioForm Medical"), and had operated for many years in the facial aesthetics market selling, among other products, Radiesse, a dermal filler that competes with Juvederm.  On July 21, 2011, Merz Aesthetics announced that it received FDA approval to market Xeomin for cosmetic use.  Xeomin is a botulinum toxin poised to compete with Botox Cosmetic.

3.    Merz Pharma is a health care company that received FDA approval in July 2010 to market Xeomin for two therapeutic purposes.  Xeomin was approved for the treatment of adults

with cervical dystonia (a condition involving the involuntary contraction of neck muscles) to decrease the severity of abnormal head position and neck pain in both botulinium toxin-naive and previously treated patients.  Xeomin also was approved for the treatment of blepharospasm (a condition involving the involuntary contraction of the eyelids) in adults previously treated with Botox.  Merz Pharma began selling Xeomin in the therapeutic neuromodulator market in late 2010.  Xeomin is a botulinium toxin that competes with Botox.

4.    Defendants Erin Sullivan, Amber Prumer, Jacqueline Luby, and Sheri Tremmel (collectively "Aesthetics Individual Defendants") were Allergan employees who worked in various parts of the country selling Allergan's aesthetics products, including Botox Cosmetic and Juvederm.  All four applied to and were hired by Merz Aesthetics in the summer of 2010.

5.    Defendants Amy Finn, Jeffrey Riordan, and Timothy Byrns (collectively "Pharma Individual Defendants") were Allergan sales representatives who sold Botox for therapeutic indications in various territories.  All three applied to and were hired by Merz Pharma as territory business managers in August 2010.

6.    The Individual Defendants executed an "Allergan Employment Agreement" upon joining Allergan, which states:

> I shall not, either during or after my employment, disclose any
> confidential information acquired because of such employment
> without the consent of an officer of the Corporation.  In general, any
> information relating [to] investigational or marketed products,
> research or manufacturing processes, business studies, business
> procedures and finances which has not been made public shall be
> considered confidential. . . .  I shall not, during the course of my
> employment, engage in any activity in competition with or against
> the best interests of the Corporation.

7.    Upon joining Allergan, and periodically thereafter, the Individual Defendants were all provided with, and required to review, Allergan's Employee Handbook and Code of Business Ethics.  At all relevant times, the Allergan Employee Handbook provided that Allergan

employees "may be exposed to confidential and sensitive information that must not become known to competitors and others outside Allergan" and that "[e]mployees who possess data of this nature are held personally responsible for its safekeeping." At all relevant times, the Allergan Code of Business Ethics provided that "[c]onfidential information must not be shared with others outside Allergan except pursuant to approved business relationships or legal mandate" and identified "[c]onfidential information" as "information that is not generally known outside Allergan, including business plans, marketing and sales programs and data, product development plans, trade secrets and other intellectual property, mergers and acquisitions, design and engineering specs, computer files, personal information about Allergan employees and any other information about Allergan and its operations not within the public domain or that is specifically designated as 'Confidential' by Allergan."

8.     Beginning in the spring of 2010, both Merz Defendants began expanding their respective sales forces in the United States in anticipation of FDA approval of Xeomin, among other things. Both companies interviewed several candidates that were then employed by Allergan. The two companies also jointly strategized and planned for the launch of Xeomin (which is an identical drug for both therapeutic and aesthetic indications) in competition with Allergan's Botox and Botox Cosmetic products.

9.     On May 14, 2010, Allergan's in-house legal counsel sent a letter to Merz Aesthetics (then still in the process of changing its name from BioForm Medical), which stated, in relevant part:

> It has come to my attention that BioForm Medical has been targeting
> Allergan sales personnel for employment. . . . While it is not
> Allergan's intention to prevent any employees from fully utilizing
> their general knowledge and skills, Allergan does intend to protect
> the integrity of its confidential information. . . .

Merz Aesthetics' in-house counsel shared this letter with Merz Pharma's in-house counsel in June 2010.

10.     On July 15, 2010, Tremmel informed Allergan that she would be leaving the company.  On July 16, 2010, each of the other Aesthetics Individual Defendants – Sullivan, Prumer, and Luby – informed Allergan that they too would be leaving the company.  Through the exit process, Allergan determined that each of the Aesthetics Individual Defendants would be joining Merz Aesthetics.  The Aesthetics Individual Defendants accepted employment with Merz Aesthetics – Sullivan and Luby on June 28, 2010, Prumer on July 7, 2010, and Tremmel on July 13, 2010 – before notifying Allergan of their plans to leave.  Sullivan signed her formal employment agreement with Merz Aesthetics on July 4, 2010, Tremmel on July 13, 2010, Prumer on July 14, 2010, and Luby on July 16, 2010.

11.     As a condition of employment with Merz, Sullivan, Prumer, Luby, and Tremmel signed written employment agreements committing that they would not "improperly use, disclose, or induce [Merz Aesthetics] to use any proprietary information or trade secrets of any former . . . employer."  In addition, they agreed not to bring onto Merz Aesthetics' premises, or transfer onto Merz Aesthetics' computer systems, any confidential data from prior employers.

12.     In July 2010, Merz Pharma made employment offers to ten former Allergan employees, including Amy Finn, Jeffrey Riordan, and Timothy Byrns.  As a condition of employment, the Pharma Individual Defendants signed Merz Pharma's Confidential Information Agreement stating they would adhere to any confidentiality obligations of their former employers and that they would not disclose to Merz Pharma any confidential information belonging to their former employers.

13.     On August 4, 2010, Allergan filed its lawsuit in Orange County Superior Court.  Two days later, Allergan sought a temporary restraining order ("TRO") at a hearing before Judge Thierry Colaw of the Superior Court.  Merz Defendants opposed Allergan's request for a TRO, and counsel for Merz Defendants stated in briefing and oral argument to the Superior Court that it "is not in possession, nor has it ever been in possession, of any of the Alleged Confidential Information," that "[t]here is no evidence that our corporate entities knew, condoned, authorized, used, disclosed, took any of these trade secrets," and that with respect to Allergan's confidential and proprietary information, Merz "[has] never seen it.  [Doesn't] know what it is.  [Doesn't]

1    want it, and [hasn't] done anything."  The Superior Court denied the TRO request without

2    prejudice to a subsequent motion by Allergan based on further investigation and discovery.

3          14.     The Merz Defendants took certain remedial actions after Allergan filed suit.

4          15.     At a national sales meeting on August 5, 2010, Merz Aesthetics General Counsel

5    Freddie Park gave all sales representatives a presentation on compliance and confidential

6    information.  Park stated that "Merz Aesthetics prohibits employees from disclosing

7    confidential/proprietary information of previous employers."

8          16.     Merz Aesthetics' management asked employees involved in referring, interviewing

9    or hiring Sullivan, Prumer, Luby, and Tremmel to search their files and return any materials that

10    they might have received in connection with the hiring of any former Allergan employee.

11          17.     Merz Pharma contacted the eight known Allergan sales representatives who had

12    recently been offered employment by Merz Pharma, including Finn, Riordan, and Byrns, and

13    instructed them not to send anything Allergan-related to Merz Pharma and not to delete anything

14    from their personal computers or electronic media storage devices.

15          18.     Shortly after, Merz Pharma gave a PowerPoint presentation to its new sales force

16    which discussed avoiding the inadvertent acquisition or use of former employer information and

17    repeated Merz Pharma's policy against solicitation or use of confidential information from a

18    former employer.

19          19.     Merz Pharma requested that every employee involved in interviewing or hiring any

20    former Allergan employees search his or her files and return any materials that might be the

21    subject of Allergan's allegations.

22          20.     At an all-company launch meeting in early September, Merz Pharma's in-house

23    counsel gave another presentation to the entire sales force reminding them not to solicit or use

24    competitors' confidential business information.

25          21.     The Merz Defendants hired Celerity Consulting Group, Inc., a third party with

26    expertise in forensic collection and the permanent deletion of electronic data.  Based on the

27    allegations in the complaint, the Merz Defendants identified at least some potential custodians of

28

1   data who were reasonably likely to have had contact or communication with Sullivan, Prumer,

2   Luby, and Tremmel during the interview process.

3       22.    Despite these efforts and others throughout the course of this litigation, the Merz

4   Defendants' searches for Allergan's trade secrets and confidential information were inadequate.

5       23.    After learning that the Aesthetics Individual Defendants were going to work for

6   Merz Aesthetics, Allergan began an investigation of their activities in the weeks before their

7   departure.  This investigation involved a review of the Aesthetics Individual Defendants'

8   computer use, including a forensic examination of the contents of the laptop computers provided

9   by Allergan that they used during their Allergan employment, and an analysis of Allergan

10  computer network activity relating to the Aesthetics Individual Defendants.

11      24.    This initial investigation uncovered multiple instances of the Aesthetics Individual

12  Defendants accessing and sending to their personal email accounts numerous documents and

13  electronic files containing Allergan's confidential and proprietary information before giving

14  notice to Allergan that they were leaving the company to join Merz Aesthetics.

15      25.    Among the information accessed and disclosed outside of Allergan by the

16  Aesthetics Individual Defendants were Excel spreadsheets containing comprehensive

17  information relating to the entire nationwide list of Allergan's nearly 24,000 physician customers

18  for Botox, including the identities of those customers, contact information for each, details

19  concerning sales volumes and future targets, and spreadsheets containing the same information

20  for the entire nationwide list of Allergan's nearly 15,000 physician customers for Juvederm.

21  Versions of these lists were obtained by Sullivan and sent to her personal email account on July

22  10, 2010, after she had signed her employment agreement with Merz Aesthetics and six days

23  before giving Allergan notice that she was resigning to join Merz Aesthetics.

24      26.    Tremmel also sent to her personal email account on July 14, 2010 –  just hours

25  before giving Allergan notice that she was resigning to join Merz Aesthetics – over 70 emails

26  containing Allergan information, including Allergan's entire Southeast Area customer list for

27  both Botox Cosmetic and Juvederm with detailed sales information for multiple time periods

28  regarding thousands of Allergan customers.

27. Similarly, Prumer accessed and sent to her personal email account on July 8, 2010, Allergan's entire West Area customer lists for both Botox Cosmetic and Juvederm with detailed sales information regarding thousands of additional Allergan customers. That same day, Prumer sent to her personal email address confidential Allergan sales training documents, including a detailed outline of Allergan's strategy for competing with Merz Aesthetics' dermal filler product Radiesse. Those documents were marked with the legend "For Sales Training Purposes Only. Do Not Duplicate or Distribute." On July 10, 2010, just six days before giving Allergan notice that she was resigning to join Merz, Prumer sent to her personal email account a confidential 24-page PowerPoint slide presentation titled "Competitive Framework: Evaluating the Competitive Dermal Filler Market," which included slides featuring a "Pivotal Trial Comparison" of Allergan's Juvederm product and Merz Aesthetics' competing Radiesse product. On July 13, 2010 – 3 days before notifying Allergan she was leaving – Prumer also sent to her personal email account a confidential Allergan report that lists every Allergan sales representative and manager in the facial aesthetics division by name, region or territory covered, specific actual sales amounts for the current quarter to date (as well as sales quotas/goals) for Botox and Juvederm, and a numerical ranking of each representative, and another report containing detailed information regarding Prumer's El Paso region customers, including names, addresses, and sales figures.

28. In June 2010, while interviewing for a position with Merz Aesthetics and while still employed by Allergan, Luby gave Merz Aesthetics employee Kevin Hedberg a document containing confidential Allergan information relating to Allergan's facial aesthetics sales force that included names, locations and sales figures, and a "30-60-90" business plan that disclosed the identities of physician customers to be targeted for business by Merz Aesthetics. In July 2010, Luby gave a copy of the same document to Merz Aesthetics employee Hyunna Coelho.

29. On August 4, 2010, the same day Allergan filed this lawsuit, Riordan and Finn informed Allergan that they would be leaving the company. On August 9, 2010, Byrns informed Allergan that he would be leaving the company. However, at the time of these notifications, each of the Pharma Individual Defendants had already signed employment agreements with

1   Merz Pharma – Riordan and Byrns on July 26, 2010 and Finn on July 27, 2010.  In addition,

2   three other Allergan employees – Craig Byrd, Jason Singleton, and Cathy Adair – informed

3   Allergan on July 27, 2010 (Byrd) and August 6, 2010 (Singleton and Adair) that they were also

4   leaving Allergan to join Merz.

5        30.    When Byrns, Finn, and Riordan began working at Merz Pharma on August 16,

6   2010, they received the company's New Hire Training, which reviews the company's policies

7   regarding confidential information.  The policies contained the following language:

8        1.    If I signed an agreement with any former employer or

9              principal regarding protection of that entity's confidential

10             business information, Merz expects and requires me to honor

11             that agreement.

12       2.    Regardless of whether I signed an agreement, under no

13             circumstances will I disclose to any Merz employee,

14             consultant, or representative any confidential business

15             information of my former employer or principal, and I

16             understand that no Merz employee, consultant, or

17             representative is permitted to ask me to do so.

18       31.    As a result of this second wave of employee departures, Allergan commenced an

19   investigation of the Pharma Individual Defendants' computer use, including a forensic

20   examination of the contents of the laptop computers provided by Allergan that they used during

21   their Allergan employment, and an analysis of Allergan computer network activity relating to the

22   Pharma Individual Defendants.

23       32.    Like its review of the Aesthetics Individual Defendants' activities, Allergan's

24   review of the Pharma Individual Defendants' activities revealed that in the weeks and days

25   leading up to their departure from Allergan, Finn, Riordan, and Byrns accessed, downloaded, or

26   otherwise obtained numerous documents and electronic files containing Allergan's confidential

27   information and then transmitted those documents and files outside of Allergan by emailing

28   them to their personal email accounts or by copying them onto portable storage media.

33.     On June 18, 2010, Finn sent to her personal email account a series of reports relating to scientific studies that Allergan is conducting on Botox.  Finn obtained the information from one of Allergan's medical staff doctors who stated that the information was being provided for "information and training only.  Please do not distribute or use in any promotional manner."  In addition, on August 2, 2010, just before her departure from Allergan, Finn made back-up files of data from her Allergan computer and then copied the back-up files and other Allergan files to a 320-gigabyte external hard drive.  Then, on August 5, 2010, Finn copied the back-up files and approximately 700 Allergan files to a second 2-terabyte external hard drive, including files that contained confidential and proprietary product, sales, customer, and employee information.  Although Finn returned the 320-gigabyte hard drive to Allergan, in her communication to Allergan she made no mention of the second 2-terabyte hard drive and the fact that she had copied hundreds of Allergan files onto it, including copies of many of the files on the returned 320-gigabyte hard drive.

34.     On August 3, 2010, the day before he gave notice to Allergan of his decision to leave the company, Riordan sent to his personal email account numerous customer and sales related reports containing Allergan's confidential information including customer names, addresses, year to date sales to each customer, and relative growth of sales for the top 100 Core Botox Therapeutic accounts in the Northwest region of the United States.  After joining Merz Pharma, Riordan disclosed to his superiors a document entitled "Xeomin Ideas," in which Riordan communicated confidential Allergan information relating to the relative success of a proprietary Allergan program and the effectiveness of another proprietary Allergan sampling program.

35.     On August 6, 2010, three days before he gave notice to Allergan of his decision to leave the company, Byrns copied approximately 30 files from his Allergan laptop to a portable USB drive and, in addition, accessed another 148 distinct files.  The files copied by Byrns include confidential Allergan sales reports, lists of Allergan employees and email addresses, confidential materials related to Botox, as well as spreadsheets titled "top doctors" and "target physicians."

10

36.     Allergan subsequently amended its complaint in this action to add Finn, Riordan, and Byrns.

37.     Through the discovery and investigation process, Allergan ultimately learned that, contrary to the statements made at the TRO hearing, Merz Pharma and Merz Aesthetics had in fact been in possession of potentially confidential Allergan information for months before that hearing.  Details concerning this information follow.

a.     On March 12, 2010, Ann Deren-Lewis, Vice President of Merz Pharma, sent an email to Dennis Condon, President of Merz Aesthetics, describing work being done by Merz Pharma on an "Experience Program tactic" and attaching a confidential Allergan PowerPoint presentation describing details (in the presentation and related electronic notes) regarding a proprietary launch program for Allergan's product Juvederm (the "JET Presentation").  Condon responded the same day, copying other Merz Aesthetics employees and attaching the JET Presentation, and noting his desire to "blend what [Deren-Lewis had] already developed with what we were hoping to accomplish."  Copies of the JET Presentation were subsequently distributed between and among various Merz Pharma and Merz Aesthetics personnel.

b.     In a May 13, 2010 email from Merz Pharma regional manager Matt Lederer to his Merz Pharma management colleagues, Lederer stated that he was in possession of Allergan's sales volumes in specific territories.  He then shared that Allergan information with Scott Szymanski, Merz Pharma's national sales director (who in turn shared them with Merz Pharma Vice President David Shoup).

c.     In a June 4, 2010 email to Michelle Jones, a Territory Business Manager at Merz Aesthetics, defendant Tremmel attached a directory of hundreds of Allergan employees in its aesthetics division that included names, titles, cost center references, territory assignments, business and home phone numbers and email addresses.  Tremmel provided the listing to Jones after a phone conversation they

1   had regarding potential recruits for Merz Aesthetics.  In the email attaching the

2   directory, Tremmel wrote to Jones, "Please keep this to yourself."

3   d.   In emails sent between July 26 and 29, 2010, Merz Aesthetics Regional Manager

4        Liz Mannix asked Prumer to draft a presentation to be shared with Merz Aesthetics

5        employees in Merz Aesthetics' Rocky Mountain Region about the Allergan Partner

6        Privileges ("APP") program, which Prumer agreed to do.  On July 27, 2010, after

7        she had resigned from Allergan, Prumer contacted a current Allergan employee to

8        obtain information for use in compiling the presentation to teach Merz Aesthetics

9        about the APP program.  The Allergan employee refused Prumer's request, and

10       instead responded by asking "What????? Come on! You work for the competition

11       now..[sic] sort of."  Prumer eventually obtained the materials regarding the APP

12       program from a different current Allergan employee.  Prumer used the APP

13       material she obtained to prepare a full presentation for the meeting that she sent to

14       Mannix.

15  e.   In an August 2, 2010 email from Lederer to recently hired Merz Pharma sales

16       representatives (including then-current Allergan employees Byrns and Singleton),

17       Lederer requested as follows:  "Competitive info – For those of you coming from a

18       competitor or former competitor, please get as much info as you can on KOL's

19       [Key Opinion Leaders], sales numbers, office volume, product info etc….. [sic]

20       This will be very valuable to everyone in the region."  The email also notes that

21       Lederer had "BCC'd everyone on this email so that [they] may remain anonymous

22       and exit [their] current positions without any problems."

23  f.   On August 10, 2010, Byrns responded to Lederer's email with an email stating that

24       he had a "flashdrive [ ] loaded up with some key account documents, SPP/payer

25       info, some [sic] BOTOX slide sets, etc."

26  g.   Singleton also responded to Lederer's email on August 10, 2010, with an email

27       attaching three confidential Allergan documents (the "Xeomin Training Modules")

28       to Lederer with a cover note stating that "[t]his is what Allergan is using to prepare

1    for real competition." The Xeomin Training Modules are marked on each page as

2    "For Internal Use Only" and "For your Information Only. Do Not Duplicate,

3    Detail, Distribute, or Use in Any Promotional Manner." Singleton's email also

4    states, "[i]f you choose to share with others, please remove my name as I am not

5    sure what liability I might have regarding this info."

6    38.    During January and February 2011, Merz Aesthetics and Merz Pharma engaged an

7    independent consultant, Norman Yee, with expertise in electronic discovery. Yee performed a

8    search for files that had previously been specifically identified by Allergan as its trade secrets,

9    using specific search terms (but excluding the stand alone word "Allergan") developed by the

10   Merz Defendants without the input of Yee. Although over 50 custodians were identified by the

11   Merz Defendants to be part of the search, the search did not include the Merz computers or Merz

12   email files belonging to the four Aesthetics Individual Defendants, and did not include any

13   portable media storage devices of any of the custodians, or any personal computers or personal

14   email accounts of any of the Individual Defendants. The software tool used for the search,

15   Microsoft's Windows Search utility, was unable to search certain file extensions or any data

16   locations other than "active" (*i.e.*, undeleted) space, and could not detect the insertion of

17   personal storage devices into any of the Merz computers. The search resulted in "thousands" of

18   file hits, but Yee did not review those files, instead turning them over to Merz Defendants and its

19   outside counsel, who only identified a handful of those files for subsequent remediation by Yee

20   from the locations where they had been found.

21   39.    The forensic examination of the Allergan computers and personal storage devices

22   used by the Individual Defendants performed by Allergan's consultant, Scott Cooper, indicated

23   that Allergan files had been deleted from those computers, and that thumb drives and other

24   electronic file storage devices used by the Individual Defendants to copy files from their

25   Allergan computers were not produced to Allergan during the discovery process. In addition,

26   none of the Individual Defendants' personal computers or storage media were collected and

27   sequestered before August 31, 2010, and some of the devices (and all of the personal web mail

28   accounts which had been the receptacles of the email transmissions of Allergan confidential

13

1    information from their Allergan email accounts) were not collected and sequestered until

2    December 2010 and January 2011.

3         40.    On July 18, 2011 – nearly a year after the TRO hearing, and just hours after the

4    parties had appeared before the Court on a pretrial scheduling conference pursuant to Federal

5    Rule of Civil Procedure 16 – counsel for Merz Pharma and Merz Aesthetics hand-delivered to

6    Allergan's counsel a box containing a letter from Merz Defendants' counsel, various hard copy

7    documents, and a CD-ROM containing various electronic documents.  In the letter, Merz

8    Defendants' counsel stated that "[i]n conjunction with discovery proceedings in the action

9    referenced above, [Merz Aesthetics and Merz Pharma] conducted a thorough search of their hard

10   copy and electronic files, as well as the hard copy and electronic files of their respective

11   employees, in an effort to identify documents that might qualify as Allergan's trade secrets or as

12   "Confidential Allergan Information.'"  Merz Aesthetics concluded this letter by stating that

13   "Merz Aesthetics and Merz Pharmaceuticals have now returned to Allergan all of the documents

14   in their respective possession, custody or control that might fall within Allergan's amended trade

15   secret designation, as well as the parties' definition of 'Confidential Allergan Information.'"

16        41.    Among the materials "returned" to Allergan with the July 18, 2011 letter were

17   electronic copies of materials discussed in paragraph 37, including: (a) the emails between and

18   among Merz Pharma and Merz Aesthetics employees attaching the JET Presentation; (b) the

19   Singleton email and attachments; (c) an Allergan booklet regarding its "Brilliant Distinctions"

20   customer loyalty program that is clearly marked "For Internal Use Only"; (d) confidential

21   PowerPoint presentations regarding Allergan's reimbursement programs; and (e) interview

22   materials with confidential Allergan information provided by Allergan employees who had

23   interviewed with Merz Pharma.  Also provided among the hard-copy documents in the box

24   accompanying the July 18, 2011 letter were two notebooks that comprise confidential material

25   (primarily slide presentations) from Allergan sales meetings, including a 2008 national Allergan

26   Neurosciences sales meeting and a sales meeting specifically addressing Allergan's

27   differentiation of Botox from other botulinum products.

28

42.     Since the July 18, 2011 letter in which their counsel represented that Merz Aesthetics and Merz Pharma had searched for and returned all documents that might qualify as Allergan trade secrets, Merz Aesthetics and Merz Pharma have sent three subsequent, similar letters "returning" more documents located in their possession that potentially contain Allergan confidential information:  one on September 19, 2011, one on December 21, 2011, and one on January 18, 2012.

43.     Neither Merz Aesthetics nor Merz Pharma has terminated or reassigned, any of the Individual Defendants or any of their employees found to be in possession of Allergan information.

44.     Before September 2010, neither Merz Aesthetics nor Merz Pharma had ever sold any botulinum toxin products to any physician or other customer in the United States.  Merz Pharma began selling Xeomin in the therapeutic market in September 2010, and among its customers are physicians who previously purchased Botox from Allergan.  Merz Aesthetics began selling Xeomin in the facial aesthetics market on a trial basis in November 2011 as part of its "Elite Opportunity" program, which ended on February 29, 2012, and among its customers in that program are physicians who previously purchased Botox Cosmetic from Allergan.  Through December 2011, Merz Aesthetics had already gained an eight percent share of the U.S. facial aesthetics market for botulinum toxins, compared to Allergan's internal projections based on prior competition with Merz in other countries that it would take Xeomin 15 months to reach a nine percent market share.

45.     The Allergan information acquired by the Merz Defendants includes the specific identities and financial details (including sales targets, actual sales amounts, and product volumes over time) of Allergan's relationship with virtually all of its physician customers in the United States for Botox Cosmetic and Juvederm, and a large segment of Allergan's physician customers in the United States for Botox (for therapeutic indications).  It also contains Allergan's strategic marketing plans, including its plans to address competition from Merz Aesthetics and Merz Pharma.  The value of this information is incalculable.

46.     Access to this information permits Merz Defendants and the Individual Defendants (together "Defendants") to precisely target their strategies, marketing and sales efforts to most effectively compete with Allergan's offerings without the time, effort, and trial and error that Defendants otherwise would have been required to invest.  Access to this information also provides Merz with a detailed roadmap to plan new products to more effectively compete with Allergan in the future, including in particular through Merz Aesthetics' full commercial launch of Xeomin, scheduled for March 12, 2012.

47.     There is overwhelming circumstantial and direct evidence that Appendix A to this Order includes Allergan trade secrets that Defendants possess and improperly acquired, disclosed, or used, and that Allergan faces a substantial threat of impending injury as a result of this misappropriation.

48.     In reviewing the witnesses presented at trial, the Court finds that numerous witnesses affiliated with Defendants were not credible.

## CONCLUSIONS OF LAW

The Court makes the following conclusions of law, including any conclusions of law found in the Findings of Fact.

49.     On February 1, 2012, the court granted summary judgment in favor of Defendants on Allergan's claims for conversion and intentional interference with prospective economic advantage, leaving Allergan's claims for misappropriation of trade secrets and breach of contract to be tried in this bench trial.

50.     In California, misappropriation of trade secrets is governed by California's Uniform Trade Secrets Act, Cal. Civ. Code § 3426 et seq. ("CUTSA").

51.     CUTSA defines a "trade secret" as information that "derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and . . . [i]s the subject of

1  efforts that are reasonable under the circumstances to maintain its secrecy."  Cal. Civ. Code §

2  3426.1(d)).

3      52.    The information claimed by Allergan to be trade secrets derive independent value

4  from not being generally known to the public or to other persons who can obtain economic value

5  from its disclosure or use.  Concerning the lists of Allergan customers and their specific

6  purchasing information and history, "[t]he requirement that a customer list must have economic

7  value to qualify as a trade secret has been interpreted to mean that the secrecy of this information

8  provides a business with a 'substantial business advantage.'  In this respect, a customer list can

9  be found to have economic value because its disclosure would allow a competitor to direct its

10  sales efforts to those customers who have already shown a willingness to use a unique type of

11  service or product as opposed to a list of people who only might be interested.  Its use enables

12  the former employee 'to solicit both more selectively and more effectively.'"  *Morlife, Inc. v.*

13  *Perry*, 56 Cal. App. 4th 1514, 1522 (1997) (quoting *Klamath-Orleans Lumber, Inc. v. Miller*, 87

14  Cal. App. 3d 458, 465-66 (1978)).

15      53.    The information claimed by Allergan to be trade secrets has been the subject of

16  efforts that are reasonable under the circumstances to maintain its secrecy.  Such efforts include

17  (a) the contractual prohibitions on the disclosure or use outside of Allergan of all confidential

18  Allergan information, as set forth in the Allergan Employment Agreements, Employee

19  Handbook, and Code of Business Ethics; (b) the use of password-protections and other

20  restrictions on access to Allergan confidential data contained in electronic form or stored on

21  computers, servers, or network locations; (c) the use of proprietary rights legends on trade secret

22  documents that were distributed in slides or in hard copy form; and (d) immediately terminating

23  a departing employee's access to Allergan's computer network and email system upon notice

24  that the employee is departing to work for a competitor.  "Reasonable efforts to maintain secrecy

25  need not be overly extravagant, and absolute secrecy is not required. . . .  The fact that a trade

26  secret was successfully misappropriated does not defeat the fact that there were reasonable

27  efforts to maintain its secrecy."  *AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.*, 663 F.3d

28  966, 974 (8th Cir. 2011).

54. Misappropriation under CUTSA means the following:

(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (2) Disclosure or use of a trade secret of another without express or implied consent by a person who: (A) Used improper means to acquire knowledge of the trade secret; or (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was: (i) Derived from or through a person who had utilized improper means to acquire it; (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or (iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Cal. Civ. Code § 3426.1(b).

55. "'Improper means' includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." Cal. Civ. Code § 3426.1(a).

56. Sullivan misappropriated Allergan's trade secrets by acquiring that information by the improper means of sending the information to her personal email account in breach of her contractual obligations to Allergan, including the obligation to maintain the confidentiality of such information, and by disclosing to Merz Aesthetics and using that information without the express or implied consent of Allergan. Much of Sullivan's testimony to the contrary was not credible.

57. Tremmel misappropriated Allergan's trade secrets by acquiring that information by the improper means of sending the information to her personal email account in breach of her contractual obligations to Allergan, including the obligation to maintain the confidentiality of

such information, and by disclosing to Merz Aesthetics and using that information without the express or implied consent of Allergan. Much of Tremmel's testimony to the contrary was not credible.

58.  Prumer misappropriated Allergan's trade secrets by acquiring that information by the improper means of sending the information to her personal email account and copying the information onto personal electronic storage media in breach of her contractual obligations to Allergan, including the obligation to maintain the confidentiality of such information, and by disclosing to Merz Aesthetics and using that information without the express or implied consent of Allergan. Much of Prumer's testimony to the contrary was not credible.

59.  Luby misappropriated Allergan's trade secrets by acquiring that information by the improper means of copying it in breach of her contractual obligations to Allergan, including the obligation to maintain the confidentiality of such information, and by disclosing to Merz Aesthetics and using that information without the express or implied consent of Allergan. Much of Luby's testimony to the contrary was not credible.

60.  Byrns misappropriated Allergan's trade secrets, by acquiring that information by the improper means of sending the information to his personal email account and copying the information onto personal electronic storage media in breach of his contractual obligations to Allergan, including the obligation to maintain the confidentiality of such information, and by disclosing to Merz Pharma and using that information without the express or implied consent of Allergan. Much of Byrns testimony to the contrary was not credible.

61.  Riordan misappropriated Allergan's trade secrets by acquiring that information by the improper means of sending the information to his personal email account and copying the information onto personal electronic storage media in breach of his contractual obligations to Allergan, including the obligation to maintain the confidentiality of such information, and by disclosing to Merz Pharma and using that information without the express or implied consent of Allergan. Much of Riordan's testimony to the contrary was not credible.

62.  Finn misappropriated Allergan's trade secrets by acquiring that information by the improper means of copying the information onto personal electronic storage media in breach of

1    her contractual obligations to Allergan, including the obligation to maintain the confidentiality

2    of such information, and by disclosing to Merz Pharma and using that information without the

3    express or implied consent of Allergan.  Much of Finn's testimony to the contrary was not

4    credible.

5         63.    The Individual Defendants' Allergan Employment Agreements are valid and

6    enforceable contracts, and based on the conduct described above, the Individual Defendants are

7    liable for breaching their Allergan Employment Agreements.

8         64.    The Merz Defendants are liable for the acts of misappropriation committed by

9    their employees and former employees.  *See Language Line Services, Inc. v. Language Services

10   Associates, LLC,* 2010 U.S. Dist. LEXIS 140350, at *3, *12 (N.D. Cal. July 13, 2010)

11   (defendant company liable for acts of trade secret misappropriation under CUTSA committed by

12   individual who "secretly took with him to Defendant" trade secrets of the plaintiff when he left

13   plaintiff to begin working for defendant, "since an act of this nature was generally foreseeable as

14   part of [his] duties to solicit customers for Defendant."); *see also Newport News Indus. v.

15   Dynamic Testing, Inc.*, 130 F. Supp. 2d 745, 748-50 (E.D. Va. 2001) (defendant company may

16   be liable for acts of misappropriation committed by prospective employee who had accepted, but

17   not begun, employment with the defendant company).

18        65.    The Merz Defendants misappropriated Allergan's trade secrets (a) through the acts

19   of the Individual Defendants described herein, (b) by acquiring that information while knowing,

20   or having reason to know, that the information had been acquired from Allergan by improper

21   means, and (c) disclosing or using that information without the express or implied consent of

22   Allergan, after using improper means to gain knowledge of the information, or knowing (or

23   having reason to know) that their knowledge of the information was either derived from or

24   through a person who had utilized improper means to acquire it or was acquired under

25   circumstances giving rise to a duty to maintain its secrecy or limit its use.

26        66.    CUTSA authorizes courts to enjoin "[a]ctual or threatened misappropriation."  Cal.

27   Civ. Code § 3426.2(a).

28

67.   Allergan has presented evidence sufficient to show that it will suffer irreparable injury if Defendants' actual or threatened misappropriation of Allergan's trade secrets is not enjoined.  *See Western Directories, Inc. v. Golden Guide Directories, Inc.*, 2009 U.S. Dist. LEXIS 52023, at *18-19 (N.D. Cal. June 8, 2009) ("The Court presumes that Plaintiff will suffer irreparable harm if its proprietary information is misappropriated."); *see also Lillge v. Verity*, 2007 U.S. Dist. LEXIS 73543, at *20 (N.D. Cal. Oct. 1, 2007) ("[T]he risk of losing established customers to defendants' new business due to defendants' improper use of plaintiff's proprietary information would obviously create lasting, irreparable harm.").

68.   Evidence of use of trade secrets "need not be direct, but may be circumstantial, as long as the evidentiary inferences to be drawn are 'reasonably deducible from the evidence, and not such as are derived from speculation, conjecture, imagination, or guesswork.'" *Think-Village Kiwi, LLC  v. Adobe Sys., Inc.*, 2009 U.S. Dist. LEXIS 106687, at *9 (N.D. Cal., Nov. 16, 2009) (quoting *Joseph DiLoreto, Inc. v. O'Neill*, 1 Cal. App. 4th 149, 161 (1991)).

69.   Monetary damages would be insufficient to address Allergan's injuries resulting from Defendants' misappropriation.  "[W]here the threat of injury is imminent and the measure of that injury defies calculation, damages will not provide a remedy at law."  *Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 423 (9th Cir. 1991); *see also CTC Communications, Inc. v. Bell Atlantic Corp.*, 14 F. Supp. 2d 133, 146 (D. Me. 1998) ("The Court finds that the task, necessary in any future determination of damages, of parsing any wrongful conduct from the ultimately permissible conduct (the solicitation itself) renders the harm caused by any breach of the duty not to use the confidential information irreparable because such harm is inextricably bound up in undemonstrable ways with the effect of the act of solicitation itself and is, therefore, both vaporous and incalculable.").

70.   An injunction in this case would serve the public interest.  "The maintenance of standards of commercial ethics and the encouragement of invention are the broadly stated policies behind trade secret law."  *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 481 (1974). "By enacting [CUTSA] in 1984, our Legislature added California to the long list of states which

1  have determined that the right of free competition does not include the right to use confidential

2  work product of others." *Morlife*, 56 Cal. App. 4th at 1520.

3      71.    Defendants did not meet their burden of demonstrating that Allergan's request for

4  injunctive relief is moot as a result of Defendants' claim that they have returned, and no longer

5  possess, any of Allergan's trade secrets.  "It is the duty of the courts to beware of efforts to

6  defeat injunctive relief by protestations of repentance and reform, especially when abandonment

7  seems timed to anticipate suit, and there is probability of resumption." *United States v. W. T.*

8  *Grant Co.*, 345 U.S. 629, 632 n.5 (1953), quoting *United States v. Oregon State Medical Society*,

9  343 U.S. 326, 333 (1952).

10     72.    "If a claim of misappropriation is made in bad faith, a motion to terminate an

11  injunction is made or resisted in bad faith, or willful and malicious misappropriation exists, the

12  court may award reasonable attorney's fees and costs to the prevailing party."  Cal. Civ. Code §

13  3426.4.

14     73.    The Court has reviewed the standards for maliciousness, and elects not to award

15  attorney's fees.

16

17

18

19

20

21

22

23

24

25

26

27

28

# APPENDIX A

| Exhibit No(s). | Description |
|---|---|
| 54 (duplicate at 221*) | Email from Amy Finn to amyfinn06@gmail.com FW: Immunogenicity |
| 74A, 75A, 150, 75C, 75D (comprise single email with attachments) | Email from Starr Prumer to prumera@gmail.com FW: Q3'10 Facial Aes Attainment and Targeting reports with attachments |
| 75E | Email from Erin Sullivan to esullivan01@gmail.com FW: Attainment Tracker with attachment |
| 80 | Email from Erin Sullivan to esullivan01@gmail.com FW: BD Top 5 in 2009 attaching BD Top 5 Year End spreadsheet |
| 88 | E-mail chain ending with e-mail from Sheri Tremmel from stremmel@cfl.rr.com, dated July 14, 2010, FW Juvederm NSM.pptx |
| 137 (pages 9-11, 25-27, 43-44, 58, 79-81) | Documents contained in Amy Finn interview materials |
| 142 | Email chain from S. Tremmel to stremmel@cfl.rr.com re One Sheet Discussion from Manager's Meeting, attaching Sell Sheets Best Practices Document |
| 143 | E-mail from Starr Prumer to prumera@gmail.com, dated July 10, 2010, with attached competitive overview document |
| 262 (pages 13-18, 72-73) | Documents contained in Todd Kaprak interview materials |
| 263 (pages 71-77) | Documents contained in Misty Tope interview materials |
| 264 (pages 5, 16-25) | Documents contained in Chris Scannapieco interview materials |
| 280 (pages 12-16, 36-40) | Documents contained in Erin Sullivan interview materials |
| 285 | Email chain from E. Sullivan to esullivan01@gmail.com re November 2007 Monthly Facial Asethetics Incentive Reports for Territory BA10302 (with attachments) |
| 288 | Spreadsheet entitled "SAP Botox Report May 2010 produced by Erin Sullivan |
| 296 | Email chain from S. Prumer to prumera@gmail.com re Weekly Sales Report - Facial Sales Team |
| 308 | Document entitled "Take advantage of exclusive Juvederm XC pricing and rewards" |
| 437 (pages 2-6, 14-19, 29-30, 117, 196-197) | Documents contained in Jacqueline Luby interview materials |
| 445 | Allergan RSS Team Roster |
| 468 | Email from J. Riordan to Steven Skaggs Re: My Garden Epiphany Attachments: Xeomin Ideas.doc |
| 492 | Email from Deren-Lewis to Coelho attaching JET Trial Presentation |

| Exhibit No(s). | Description |
|---|---|
| 0493 | Email chain from A. Deren-Lewis to K. Church re Experience Program Notes, attaching JET Trial_background PowerPoint presentation (MERZ_PHA004645-004667) (Shoup Depo Exh. 493) |
| 519 | Email from S. Tremmel to S. Tremmel attaching Allergan Medical Directory |
| 528 | 6/6/2010 9:31 A.M. Tremmel email forwarding to herself attainment reports and customer lists (attachments excerpted) |
| 529 | 6/6/2010 9:32 A.M. Tremmel email forwarding to herself attainment reports and customer lists (attachments excerpted) |
| 530 | 6/6/2010 9:33 A.M. Tremmel email forwarding to herself attainment reports and customer lists (attachments excerpted) |
| 531 | 6/6/2010 9:33 A.M. Tremmel email forwarding to herself attainment reports and customer lists (attachments excerpted) |
| 532 | 6/6/2010 11:09 A.M. Tremmel email forwarding to herself attainment reports and customer lists (attachments excerpted) |
| 533 | 6/6/2010 11:10 A.M. Tremmel email forwarding to herself attainment reports and customer lists (attachments excerpted) |
| 534 | Email chain from S. Tremmel to S. Tremmel re Q4 Attainment & Targeting Reports (TREM 27209) (Tremmel Depo Exh. 534) |
| 535 | 7/1/2010 4:55 PM Tremmel email forwarding to herself attainment reports and customer lists (attachments excerpted) |
| 538 | 7/14/2010 9:19 AM Tremmel email forwarding to herself attainment reports and customer lists (attachments excerpted) |
| 541 | 7/14/2010 10:00 AM Tremmel email forwarding to herself attainment reports and customer lists (attachments excerpted) |
| 559 | Email chain from J. Riordan to R. Chase re Merz Pharmaceuticals - Reference Checks and Performance Documentation (with attachments) |
| 565 | Email from J. Riordan to jsriord@gmail.com re Report(2).xlsx (with attachment) |
| 1041 (duplicate at 575) | March 11, 2011 Email from Condon to Altavilla re Belotero Experience Program |
| 1042 | March 12, 2010 Email from Condon to Deren-Lewis re Belotero Experience Program |
| 1051 | March 12, 2010 Email from Deren-Lewis to Condon re Belotero Experience Program |
| 1053 (duplicate at 339) | Brilliant Distinctions FAQ |

| Exhibit No(s). | Description |
|---|---|
| 1058 (duplicates at 429) | June 4, 2010 Email from Tremmel to Jones attaching Allergan Medical Directory |
| 1070 (partial duplicate at 163) | June 16, 2010 Email from Scannapieco to Lederer attaching customer list and incentive compensation report |
| 1074 (duplicate at 1077) | November 4, 2009 Email from Deren-Lewis to Edwards, et al. re Experience Program Notes |
| 1078 | July 6, 2009 Lewis e-mail re JET Trial |
| 1079 | "Botox Nation"  binder |
| 1080 | "Exploring Differences" Binder |
| 1103 | ESI with file name "2009FinalRankxls.xls" |
| 1104 | ESI with file name "TARGET PHYSICIAN LIST.xls" |
| 1105 | ESI with file name "Top Doctors Spreadsheet.xls" |
| 1205 | 2/2/10 Email from Pappert to Grundy and Bevers attaching Allergan CD Probe protocol |
| 1208 | 2/4/10 Email from Pappert to Hardas attaching Allergan CD Probe protocol |
| 1212 (partial duplicate at 5) | July 10, 2010 Email from Sullivan to Sullivan attaching attainment report and national customer lists |
| 1213 (partial duplicates at 71B, 72A, 146, 147, 148) | July 8, 2010 email from Prumer to Prumer attaching attainment report and customer lists |
| 1214 (duplicate at 87) | July 8, 2010 email from Prumer to Prumer attaching Radiesse Facts at a Glance document |
| 1217 (duplicate at 564) | August 3, 2010 email from Riordan to Riordan attaching sales tracking report |
| 1219 (duplicate at 53*) | Email from Jeffrey Riordan to jsriord@gmail.com FW: Monthly NMC Core Sales |
| 1220 (duplicate at 52) | August 3, 2010 email from Riordan to Riordan attaching NMC Monthly Core Accounts Data |
| 1222 (partial duplicate at 539) | July 14, 2010 email from Tremmel to Tremmel at 9:34 am attaching 4 emails, which in turn attach attainment reports and customer lists |
| 1223 (partial duplicate at 540) | July 14, 2010 email from Tremmel to Tremmel at 9:56 am attaching 3 emails, which in turn attach attainment reports and customer lists |
| 1231 (duplicates at 177, 459) | August 10, 2010 email from Singleton to Lederer attaching Allergan ACT Modules re Xeomin |
| 1232 and other Ship-To report files identified on pages 43-53 of Exhibit 3009 with the following bates numbers:  FINN 003004; FINN 003031; FINN 003463; FINN 003490; FINN 003192; FINN 010028; and FINN 010036 | Ship-to customer and sale reports |
| 1234 and other START report files identified on pages 43-53 of Exhibit 3009 with the following bates numbers:  FINN 010857; FINN 011040; FINN 011122; FINN 011313; FINN 011402; and FINN 010794 | START customer contact reports |

| Exhibit No(s). | Description |
|---|---|
| 1235 and other "Purple" report files identified on pages 43-53 of Exhibit 3009 with the following bates numbers:  FINN 010132; FINN 010265; and FINN 008480. | "Purple" customer and sale reports |
| 1237 | ESI with file name "Xeomin Merz Truong & Dysport Obj WebEx June 28, 2010.ppt" |

IT IS SO ORDERED.

DATED: March 9, 2012

_____
Andrew J. Guilford
United States District Judge