Frederick L. McKnight (State Bar No. 55183)
Richard J. Grabowski (State Bar No. 125666)
Sharyl A. Reisman (State Bar No. 2889251)
Steven M. Zadravecz (State Bar No. 185676)
szadravecz@jonesday.com
JONES DAY
3161 Michelson Drive, Suite 800
Irvine, CA 92612-4408
Telephone:  949.851.3939
Facsimile:   949.553.7539

Attorneys for Defendant and Counterclaimants
MERZ PHARMACEUTICALS, LLC and
MERZ AESTHETICS, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| ALLERGAN, INC., a Delaware Corporation,<br><br>          Plaintiff,<br><br>     v.<br><br>MERZ PHARMACEUTICALS, LLC, a North Carolina corporation, et al.,<br><br>          Defendant.<br><br>---<br><br>MERZ PHARMACEUTICALS, LLC, a North Carolina Corporation,<br><br>          Counterclaimants,<br><br>     v.<br><br>ALLERGAN, INC., a Delaware corporation,<br><br>          Counterdefendant. | **Case No. SACV 11-446 AG (Ex)**<br><br>Assigned for all purposes to Honorable Andrew J. Guilford<br><br>**SECOND STATUS REPORT REGARDING CORPORATE COMPLIANCE PROGRAM**<br><br>*[Declarations of Kathy Gravitt, Michelle Kappie, Mary Benway, Wendy Alexander, and Kenneth C. Koch filed concurrently herewith]* |

I.     **INTRODUCTION**

Merz Pharmaceuticals, LCC ("Merz Pharma") and Merz Aesthetics, Inc. ("Aesthetics") (collectively referred to as "Merz")[1] submit this Second Status Report as required by this Court's March 9, 2012 Injunction Order (the "Injunction"). Pursuant to the terms of the Injunction, Merz was ordered to report to the Court at six, twelve, and eighteen month intervals on the status of "compliance programs to: (1) ensure compliance with [the] Injunction; and (2) prevent, deter, and detect existing and future violations of the [California Uniform Trade Secrets Act]." (Injunction at 3:15-19.) The Injunction was modified by order of the Court on October 1, 2012 to terminate Paragraphs 1, 2, 3, and 4 of the Injunction and to narrow the scope of the compliance requirements to require reports at six and twelve month intervals only (for purposes of this Second Status Report, the Injunction as modified by this Court's October 1, 2012 Order will be referred to as the "Amended Injunction"). (Dkt. No. 368.) Accordingly, this is Merz's second and final report.

Since the Injunction was issued, Merz has invested significant time and resources to continue, enhance and implement compliance programs as required by the Injunction. The steps taken by Merz are summarized below and further described in the declarations and documents submitted herewith, as well as the materials Merz submitted with its original Status Report Regarding Corporate Compliance Program.[2]

---

[1] In actions unrelated to the Injunction, Merz Pharma and Aesthetics have begun a process to combine operations into a single North American operating entity. As of the date of this Second Status Report, the corporate identities are still separate, so where needed for clarity, reference may be made to Merz Pharma or Aesthetics separately. This occurs most often in historical context, but may also indicate that the integration of certain policies has not yet been finalized.

[2] Merz makes reference in this Second Status Report to interrogatories, declarations and other evidence submitted with the original Status Report Regarding Corporate Compliance Program filed on September 7, 2012. (Dkt. No. 356.) Merz does not, however, submit with this Second Status Report the evidence it already supplied with the September 7, 2012 Status Report.

SECOND STATUS REPORT REGARDING
CORPORATE COMPLIANCE PROGRAM
SACV 11-499 AG (Ex)

II.   **COMPLIANCE WITH INJUNCTION REGARDING ALLERGAN'S TRADE SECRETS**

Section 1 of the Injunction enjoined Merz from "retaining, disclosing, or using Allergan's trade secrets." (Injunction at 2:6.) Merz was further ordered to search for and remove Allergan trade secrets ("the Examination and Remediation Process"). (*Id.* at 2:23-3:7.) Under the Amended Injunction, the restrictions of Section 1 were lifted as of October 1, 2012

On August 30, 2012, Merz submitted its Final Examination and Remediation Report ("Remediation Report"), which detailed the substantial and thorough process Merz completed to remove any potential Allergan trade secrets from its files. The Remediation Report, as well as the Expert Reports, declarations and evidence submitted therewith, and the declarations and evidence submitted with Merz's Motion to Modify the Injunction, which describe more fully all of Merz's efforts to comply with Section 1 of the Injunction and the Examination and Remediation Process, are hereby incorporated by reference. (See Dkt. Nos. 350 and 351.)

III.   **COMPLIANCE WITH INJUNCTION REGARDING PROHIBITION ON SALES AND SOLICITATION ACTIVITIES**

Section 2 of the Injunction enjoined Merz from:

> [P]roviding or selling Xeomin, or soliciting purchases of Xeomin, in the facial aesthetics market for a period of ten months from the date of [the Injunction]

(Injunction at 2:7-8.) Under the Amended Injunction, the restrictions of Section 2 were lifted as of January 9, 2013. (Dkt. No. 368.)

Sections 3 and 4 of the Court's March 13, 2012, Injunction enjoined Merz from:

SECOND STATUS REPORT REGARDING
CORPORATE COMPLIANCE PROGRAM
SACV 11-499 AG (Ex)

1          [P]roviding or selling Xeomin, or soliciting purchases of

2          Xeomin, in the therapeutics market for a period of ten

3          months from the date of [the Injunction] to Allergan

4          customers identified in Trial Exhibits 262, 263, 565,

5          1070, 1104, 1105, 1217, 1219, 1220, 1232, 1234, 1235,

6          except to customers who voluntarily and without

7          solicitation request to purchase Xeomin for therapeutic

8          purposes from Merz Defendants, provided that sworn

9          declarations are submitted that such requests were made

10         voluntarily and without solicitation;

11         [P]roviding or selling dermal filler products, or soliciting

12         purchases of dermal filler products, in the facial aesthetics

13         market for a period of ten months from the date of [the

14         Injunction], except to customers who voluntarily and

15         without solicitation request to purchase dermal filler

16         products from Merz Defendants, provided that sworn

17         declarations are submitted that such requests were made

18         voluntarily and without solicitation, or customers who

19         purchased dermal filler products from Merz Defendants

20         (including BioForm Medical) between July 1, 2009 and

21         June 30, 2010, provided that sworn declarations are

22         submitted identifying such customers…

23  (Injunction at 2:7-26.)  Under the Amended Injunction, the restrictions of Sections

24  3 and 4 were lifted as of November 1, 2012. (Dkt. No. 368.)

25         As explained in Merz's original Status Report and accompanying evidence,

26  Merz implemented numerous protocols to ensure compliance with the Injunction's

27  sales and solicitation prohibitions.  (See Dkt. No. 356, including Merz

28  Pharmaceuticals, LLC's Response to Plaintiff and Counter-Defendant Allergan,

1  Inc.'s Post-Injunctions Interrogatories Nos. 1-10 ("Merz Pharma Responses"), and

2  Merz Aesthetics, Inc's Response to Plaintiff and Counter-Defendant Allergan,

3  Inc.'s Post-Injunctions Interrogatories Nos. 1-10 ("Aesthetics Responses").)  We

4  briefly summarize those sale-related protocols in the sections that follow and

5  confirm that they remained in place during the time the Injunction was in effect.

### A. MERZ PHARMA'S COMPLIANCE WITH THE INJUNCTION'S SALE RESTRICTIONS

8  On November 1, 2012, Merz Pharma began selling Xeomin for therapeutic or

9  medical use without restrictions consistent with the provisions of the Amended

10  Injunction.  Between the date the Injunction was imposed and November 1, 2012,

11  Merz Pharma followed the processes outlined below for sales of Xeomin for

12  therapeutic or medical uses.

13  Promptly after the Injunction originally issued, Merz Pharma developed a

14  Xeomin "Do Not Call" or "Not Safe to Call" ("DNC") List from the customers or

15  accounts identified in Trial Exhibits 262, 263, 565, 1070, 1104, 1105, 1217, 1219,

16  1220, 1232, 1234, and 1235, and also created "Free to Call" ("FTC") List for

17  customers or accounts that did not fall within the scope of the Injunction.[3]  (Merz

18  Pharma Responses at 2:24-3:5.)  During the Injunction period, Merz Pharma sales

19  personnel, including all customer service and field sales employees, were

20  prohibited from soliciting purchases from, or promoting Xeomin to any customer or

21  account on the DNC List.  (*Id.* at 3:8-10; Declaration of Kathy Gravitt In Support of

22  Second Status Report Regarding Corporate Compliance Program, concurrently

---

[3] As noted in the Compliance Report filed with the court in September 2012, the actual DNC List was not available to any Merz Pharma employee who was not authorized under the Protective Order and the Stipulation to Allow Two Merz Pharmaceutical Employees Access to Do Not Call List to Review the DNC List. Only Merz Pharma's Chief Compliance Officer (Katrina Church), Executive Director of Commercial Analytics (Jeff Morgan), and the Manager of Customer Service (Kathy Gravitt), have access to the DNC List.  After November 1, 2012, Merz Pharma took steps to remove all copies of the DNC List from its computer systems.  Declaration of Kenneth C. Koch in Support of Second Status Report Regarding Corporate Compliance Program ¶¶ 4-6.

SECOND STATUS REPORT REGARDING
CORPORATE COMPLIANCE PROGRAM
SACV 11-499 AG (Ex)

filed with this Second Status Report, ("Gravitt Decl.") ¶¶ 5-7.)  To the extent Merz Pharma sales personnel received calls, faxes, or emails from customers or accounts not on the FTC List, they were strictly prohibited from soliciting the purchase of, or promoting Xeomin in any fashion. (*Id.* at 4:15-17; Gravitt Decl. ¶¶ 5-7.)  Instead, sales personnel were required to follow an established protocol to verify whether or not the customer or account was on the DNC List. (*Id.* at 4:17-19; Gravitt Decl. ¶¶ 5-7.)  Sales personnel were only permitted to discuss, promote or solicit the sale of Xeomin if, and only if, it was determined that the customer or account was not on the DNC List. (*Id.*)  If, after following the established protocol, a sales employee was advised that the customer or account was not safe to call on, the employee was required to respond to the request in relevant part by stating that Merz Pharma could not promote or sell Xeomin to the customer or account and referring the call or request to Merz Pharma's customer service group. (*Id.* at 4:18-25; Gravitt Decl. ¶¶ 5-7.)

Xeomin is purchased directly from the Merz Pharma Customer Service Center; customers or accounts cannot purchase Xeomin from, or place orders through, Merz Pharma sales personnel. (*Id.* at 5:1-3.)  During the period of the Injunction, if a sales employee received an unsolicited inquiry from any customer or account that was not on the FTC List seeking to purchase product, and was determined to be on the DNC List, the employee was required to direct the customer or account to the Merz Pharma Customer Service Center, the sole individuals responsible for handling the screening of voluntary and unsolicited customers. (*Id.* at 5:3-7; Gravitt Decl. ¶¶ 4-7.)

Customer Service Center personnel were required to adhere to a strict protocol and script developed by Merz Pharma in order to ensure compliance with the Injunction. (*Id.* at 5:8-12; Declaration of Kathy Gravitt Regarding Voluntary and Unsolicited Requests by Customers to Purchase Xeomin from Merz Pharmaceuticals, LCC ("Gravitt Decl. Re Voluntary and Unsolicited Requests") at

1   ¶¶ 6-9, at Dkt. No. 356.)  Merz Pharma's Customer Service Center personnel were

2   prohibited from deviating from the approved script, and were forbidden from

3   promoting the purchase or soliciting the sale of Xeomin to customers or accounts

4   on the DNC List. (Merz Pharma Responses at 5:15-17.)  Pursuant to this protocol,

5   the Customer Service Center personnel could take the potential customer's or

6   account's call for an order, but could not authorize the product to be shipped until

7   the customer's or account's name was checked against the DNC List by either Mr.

8   Morgan, Ms. Gravitt, or Ms. Church.  (Gravitt Decl. Re Voluntary and Unsolicited

9   Requests at ¶ 7.)

10      Xeomin was permitted to be shipped to potential customers who were

11   verified as not appearing on the DNC List.  (*Id.* at ¶ 8.)  However, pursuant to the

12   protocol, customers or accounts that did appear on the DNC List first had to be

13   contacted and were only able to purchase Xeomin if the customer or account

14   verified to Merz Pharma in writing that their request to purchase Xeomin was both

15   voluntary and unsolicited.  (Merz Pharma Responses at 5:17-24; Gravitt Decl. Re

16   Voluntary and Unsolicited Requests at ¶ 8.)  As Manager of the Customer Service

17   Center, Ms. Gravitt had primary responsibility for making these "confirmation"

18   calls to DNC customers or accounts that placed orders for Xeomin.  (Gravitt Decl.

19   Re Voluntary and Unsolicited Requests at ¶ 8.)  If the customer or account

20   expressly affirmed that the order was voluntary and unsolicited, the customer or

21   account was sent a document to confirm in writing that the request was indeed

22   voluntary and unsolicited.  (Merz Pharma Responses at 5:17-24; Gravitt Decl. Re

23   Voluntary and Unsolicited Requests at ¶ 8.)  No product was permitted to be

24   shipped to a customer or account on the DNC List until the customer or account

25   returned the executed document attesting that the purchase was voluntary and

26   unsolicited.  (Gravitt Decl. Re Voluntary and Unsolicited Requests at ¶ 8.)  The

27   staff in Merz Pharma's Customer Service Center could not input the order

28   information until after this verification was received, and product was not released

1    for shipment until those steps were complete. (*Id.*)

2       If a customer or account was on the FTC List, but was listed as an

3    ophthalmologist or an "unspecified" specialty, the customer or account was asked,

4    according to a specific script, whether the purchase was for facial aesthetic use.  If

5    the customer or account indicated the purchase was intended for facial aesthetic

6    use, Merz Pharma's Customer Service Center personnel informed the customer or

7    account that Merz Pharma could not sell Xeomin for use in the facial aesthetics

8    market. (*Id.* at ¶ 6.)  This procedure (related to aesthetic use) continued in effect

9    until January 9, 2013, when the Injunction's restrictions under Paragraph 2 were

10    lifted.  (Gravitt Decl. ¶ 7.)

11    **B.    AESTHETICS' COMPLIANCE WITH THE INJUNCTION'S**
12    **SALES RESTRICTIONS**

13       On January 9, 2013, Aesthetics began selling Xeomin without restrictions

14    related to the Injunction, consistent with the provisions of the amended Injunction

15    Order.  Between the date the Injunction was imposed and January 9, 2013,

16    Aesthetics followed the processes outlined below for sales of Xeomin for facial

17    aesthetic uses.

18       From the date of the Injunction until January 9, 2013, Aesthetics prohibited

19    its Territory Managers, Medical Affairs field personnel and Customer Service

20    Representatives from providing, selling, soliciting or promoting the sale of Xeomin

21    to any customer or account.  In this regard, Aesthetics sales personnel and

22    Customer Service Representatives were all given a scripted response to customer or

23    account inquiries regarding Xeomin, requiring that they inform customers and

24    accounts that Xeomin could not be provided or sold.  (Aesthetics Responses at

25    3:16-17, 5:17-21, 6:4-6, 7:25-27; Declaration of Mary Benway In Support of

26    Second Status Report Regarding Corporate Compliance Program ("Benway Decl.")

27    ¶ 5-6.)

28       On November 1, 2012, Aesthetics began selling Radiesse and Belotero

1    without restrictions related to the Injunction, consistent with the provisions of the

2    amended Injunction Order.  Between the date the Injunction was imposed and

3    November 1, 2012, Aesthetics followed the processes outlined below for sales of

4    Radiesse and Belotero.

5           As described in Merz's first Status Report submitted to this court on

6    September 7, 2012, Aesthetics created "Red Lists" of customers who fell within the

7    sales and solicitation injunction on Radiesse and Belotero (i.e., customers or

8    accounts that did not purchase dermal filler products from Aesthetics between July

9    1, 2009 and June 30, 2010).  (Aesthetics Responses at 2:23-27.)

10          During the period of the Injunction, Aesthetics' Territory Managers were

11   strictly prohibited from providing, selling, or promoting the sale of Radiesse or

12   Belotero to any Red List customer or account; and were likewise prohibited from

13   engaging in any solicitation or promotional activities with Red List customers or

14   accounts.  (*Id.* at 3:16-4:5; Benway Decl. ¶¶ 5-6.)  If a Red List customer or account

15   contacted a Territory Manager to discuss or place an order for Radiesse or Belotero,

16   the Territory Manager was prohibited from discussing the request with the customer

17   or account or from filling any type of product order or request.  (*Id.* at 4:6-9.)

18   Territory Managers were given a script they were required to follow when handling

19   phone inquiries from a Red List customer or account, and were not allowed to

20   respond to email inquiries.  (*Id.* at 4:10-21.)  All such inquiries were required to be

21   forwarded to a designated Response Team formed by Aesthetics for purposes of

22   responding to such customer inquiries.  (*Id.* at 4:21-22.)  Requests for marketing

23   materials originating from Red List customers or accounts were required to be

24   handled in the same manner.  (*Id.* at 4:23-25.)  Further, if a Territory Manager

25   received an inquiry from a Red List customer or account regarding a "product

26   event" for which the Territory Manager had previously committed to pay for food,

27   the Territory Manager was required to inform the customer or account, according to

28   a pre-approved script, that: Aesthetics was temporarily unable to support Radiesse

SECOND STATUS REPORT REGARDING
CORPORATE COMPLIANCE PROGRAM
SACV 11-499 AG (Ex)

1   events. (*Id.* at 5:8-15.; Benway Decl. ¶¶ 5-6.)

2         Until November 1, 2012, Aesthetics' Customer Service Representatives were

3   also prohibited from entering orders for, selling, soliciting or promoting Radiesse or

4   Belotero to any Red List customer or account. (*Id.* at 6:6-8.) If a Customer Service

5   Representative received a call from a Red List customer or account that placed an

6   order and asked why the order was not received, the Customer Service

7   Representative was required to deliver a pre-approved scripted response, informing

8   the customer or account that Aesthetics was temporarily restricted from selling or

9   providing Radiesse and Belotero except to customers who purchased Radiesse from

10   Aesthetics between July 1, 2009 and June 30, 2010. (*Id.* at 6:8-17.; Benway Decl.

11   ¶¶ 5-6.)

12         If an Aesthetics Customer Service Representative received an unsolicited call

13   from a Red List customer or account seeking to purchase Radiesse or Belotero, the

14   Customer Service Representative was not permitted to place the order, even if the

15   customer or account insisted. (*Id.* at 6:17-19.) Instead, the Customer Service

16   Representative was required to adhere to a detailed script and protocol, which

17   required transfer of the inquiry to a designated Aesthetics Response Team member.

18   (*Id.* at 6:20-28.) Customer Service Representatives were not permitted to place

19   orders for marketing materials, which inquiries had to  be referred to the Response

20   Team. (*Id.* at 7:1-3; 7:3-10.)

21         Aesthetics created a dedicated Response Team whose primary task during the

22   period of the Injunction was to respond to inquiries from Red List customers or

23   accounts that voluntarily and without solicitation sought to purchase dermal filler

24   products. (*Id.* at 7:19-21; Declaration of Mary Benway Regarding Voluntary and

25   Unsolicited Requests by Customers to Purchase Dermal Filler Products from Merz

26   Aesthetics, Inc.  Benway Decl. Re Voluntary and Unsolicited Requests at ¶ 4; Dkt.

27   356.) This Response Team was also responsible for responding to customer or

28   account inquires forwarded by Aesthetics' Territory Managers and Customer

SECOND STATUS REPORT REGARDING
CORPORATE COMPLIANCE PROGRAM
SACV 11-499 AG (Ex)

1  Service Representatives pursuant to the protocols discussed above. (Aesthetics

2  Responses at 7:21-25.) The Response Team followed detailed scripts and protocols

3  to confirm that, to the extent a customer or account sought to purchase Radiesse,

4  the request was voluntary and unsolicited. (*Id.* at 8:1-19; Benway Decl. Re

5  Voluntary and Unsolicited Requests at ¶¶ 4, 8.)

6       The member of the Response Team assigned to respond to a particular

7  inquiry was permitted to call the customer or account and leave a message no more

8  than once a week, and not more than three (3) times. (Benway Decl. Re Voluntary

9  and Unsolicited Requests at ¶ 6.) If the customer or account did not return the call,

10  Aesthetics' systems were updated to ensure that no further efforts were made to

11  contact the customer or account. (*Id.*) If the designated member of the Response

12  Team was able to reach the customer or account, he or she was forbidden to deviate

13  from the approved scripts, and was barred from prompting or asking the customer

14  or account if it wished to purchase Radiesse or would like Aesthetics to send the

15  documentation required to process a product purchase request. (Aesthetics

16  Responses at 8:10-13.) If, and only if, the customer or account affirmatively asked

17  to purchase Radiesse, and the Response Team confirmed that the request was

18  voluntary and unsolicited, was the customer or account sent a document (known as

19  a "Voluntary Request Form") to confirm in writing that the request was indeed

20  voluntary and unsolicited. (Aesthetics Responses at 8:13-19; Benway Decl. Re

21  Voluntary and Unsolicited Requests at ¶¶ 10, 12.) The Response Team did not

22  engage in any follow-up communication to prompt customers or accounts to return

23  the Voluntary Request Form. (Benway Decl. Re Voluntary and Unsolicited

24  Requests at ¶ 13.) Aesthetics implemented the identical process in conjunction

25  with the launch of Belotero Dermal Filler, which was approved by the FDA after

26  the Injunction was ordered. All inquiries from Red List customers or accounts

27  wishing to purchase Belotero were handled in the same manner as inquiries

28  regarding the sale of Radiesse to Red List customers/accounts. The procedures

SECOND STATUS REPORT REGARDING
CORPORATE COMPLIANCE PROGRAM
SACV 11-499 AG (Ex)

1    described related to Radiesse and Belotero remained in effect until the Injunction's
2    restrictions in Section 4 were lifted on November 1, 2012; the procedures related to
3    Xeomin remained in effect until Section 2 of the Injunction was lifted on January 9,
4    2013.  (Benway Decl. ¶¶ 5-6.)

5    **IV.    COMPLIANCE PROGRAMS TO PREVENT, DETER AND DETECT**
6         The final paragraph of the Injunction ordered Merz to continue and
7    implement compliance programs designed to "prevent, deter, and detect existing
8    and future violations of [the California Uniform Trade Secrets Act.]"  (Injunction at
9    3:16-17.)
10        Merz expects that applicants, employees, temporary employees, and
11   consultants will refrain from bringing or using confidential, proprietary, and trade
12   secret information from any former employer to Merz.  To that end, both Merz
13   Pharma and Aesthetics have developed and maintain comprehensive protocols
14   designed to prevent, deter and detect violations of these policies.  (Declaration of
15   Michelle Kappie In Support Of Report Regarding Corporate Compliance Program
16   ("First Kappie Decl.") at ¶ 3; Declaration of Wendy Alexander In Support Of
17   Report Regarding Corporate Compliance Program ("First Alexander Decl.") at ¶ 3;
18   Declaration of Katrina Church In Support Of Report Regarding Corporate
19   Compliance Program at ¶ 3 ("First Church Decl."), at Dkt. No. 356.)  Moreover,
20   since the issuance of the Injunction, both Merz Pharma and Aesthetics have devoted
21   significant time, resources and efforts to strengthening their protocols.  In the
22   sections that follow, we describe the compliance protocols in place for applicants,
23   new employees, existing employees, temporary employees, and consultants.

24   **A.    MERZ PHARMA PROTOCOL**
25        Merz Pharma has numerous processes in place that reinforce its commitment
26   to deterring applicants and employees from bringing and/or using confidential,
27   proprietary, and trade secret information from former employers to Merz Pharma.
28

1    **<u>Interviewing and Hiring.</u>**

2        Merz Pharma's commitment to deterring and detecting violation of its

3    policies begins before an applicant is even interviewed.  Any individual involved in

4    interviewing and/or hiring an applicant is issued a memorandum outlining Field

5    Interviewing Guidelines ("Guidelines").  (First Alexander Decl. at ¶ 4;Ex. 1.)

6    These Guidelines expressly provide that:

7            Merz employees must refrain from acquiring, retaining,

8            using or disclosing, or inducing others, including job

9            applicants, to acquire, use or disclose on Merz's behalf,

10           any Confidential Information belonging or relating to any

11           other company, including former employers and Merz's

12           competitors.  Merz prohibits its employees from bringing

13           onto the premises of the Company or transferring onto the

14           Company's technology system any unpublished

15           document, proprietary information, or trade secret

16           belonging to any such employer, person or entity unless

17           consented to in writing by both the Company and such

18           employer, person, or entity.

19   (*Id.*)  The Guidelines also make very clear that failure to comply with their terms

20   can result in termination of employment:

21           In this competitive environment, failure to comply with

22           the Guidelines referenced in this document can result in

23           corrective action, up to and including termination.

24   (*Id.*)  All individuals involved in interviewing and/or hiring an applicant must

25   review the Guidelines and must execute an Acknowledgement indicating they have

26   read, and will comply with, the Guidelines.  (*Id.*)

27       As a further effort to ensure compliance with its policies, Merz Pharma

28   requires that all employees who manage one or more people participate in Manager

SECOND STATUS REPORT REGARDING
CORPORATE COMPLIANCE PROGRAM
SACV 11-499 AG (Ex)

1   Training.  (First Alexander Decl. at ¶ 5; Ex. 3.)  The Manager Training, which

2   includes pre- and post-tests, reminds Managers of Merz Pharma's Confidential

3   Information Policies, and instructs Managers to contact the Ethics Hotline if they

4   are aware of any violations.  (*Id.*)  As an additional precaution, only those Managers

5   who have completed the Manager Training are permitted to interview candidates

6   alone.  (*Id.*. at ¶ 4.)  Managers who have not undergone the Manager Training may

7   only interview candidates in the presence of a member of the Human Resources

8   Department.  (*Id.*)

9        In a further effort to ensure that applicants and employees do not bring and/or

10  use confidential, proprietary, and trade secret information from former employers to

11  Merz Pharma, various Merz Pharma personnel responsible for hiring are also

12  provided with additional training addressing how to identify and interview

13  candidates ("Interviewing and Hiring Training").  (*Id.* at ¶ 5; Ex. 4.)  The

14  Interviewing and Hiring Training clearly instructs these personnel to seek out

15  candidates who will adhere to Merz Pharma's policies and procedures, including its

16  Confidential Information Policy.  (*Id.*)  The Interviewing and Hiring Training

17  incorporates the Guidelines.  (*Id*; Ex. 1.)

18       Before an applicant is permitted to interview at Merz Pharma, he or she must

19  sign a document acknowledging his or her receipt and review of Merz Pharma's

20  Confidential Information Policy.  (*Id.* at ¶ 7; Ex. 6.)  Merz Pharma has also

21  developed a memorandum that is given to all applicants before they are permitted to

22  interview.  (*Id.* at ¶ 7.)  Applicants are required to review the memorandum, which

23  sets forth the Confidentiality Expectation for all Merz Pharma Employees.    The

24  memorandum cautions that Merz Pharma does not want employees to bring any

25  third-party's confidential information with them to Merz Pharma.  (*Id.*; Ex. 7.)

26  Before an applicant can accept an offer of employment, a member of Merz

27  Pharma's Human Resources Department contacts the applicant to discuss the

28  memorandum and its terms.  (*Id.*. at ¶ 7.)  Applicants are not permitted to begin

1  working at Merz Pharma unless and until they sign and agree to be bound by the

2  terms of the memorandum. (*Id.*)

3      The interview and hiring guidelines detailed in the paragraphs above remain

4  in effect as of the date this Second Status Report is filed. (Declaration of Wendy

5  Alexander in Support of Second Status Reported Regarding Corporate Compliance

6  Program at ¶¶ 4-5.)

7      **Employee Training.**

8      Merz Pharma's protocol also focuses on training and emphasis of its policies

9  for both new and current employees, all of whom are expected to fully comply with

10  Merz Pharma's policies concerning confidential information throughout their

11  employment. (First Alexander Decl. at ¶ 4.)  All new employees must undergo

12  training regarding Merz Pharma's Confidential Information Policy. (*Id.* at ¶ 5)

13  Specifically, as part of their orientation, all new employees must complete training

14  that summarizes Merz Pharma's employment policies ("Employment Policies

15  Training"). (Id; Ex. 2.)  This Employment Policy Training explicitly reminds

16  employees of their obligations under Merz Pharma's Confidential Information

17  Policy, stating in part that:

18          It is incumbent upon our employees to maintain the

19          confidentiality of the Company's as well as prior

20          employer's proprietary information while employed by,

21          and following termination of employment

22  (*Id.*)

23      In addition to the trainings provided by the Human Resources Department,

24  the Compliance Department also provides new and current employees with

25  trainings regarding Merz Pharma's Confidential Information Policy (First Church

26  Decl. at ¶ 4; Exs. 1, 2, and 3.)  While these trainings are adapted for the group that

27  is being trained, the elements of the trainings remain the same. (Id at ¶ 4.)  These

28  trainings once again specifically direct employees to contact Merz Pharma's Ethics

1   Hotline if they have any concerns.  (Id; Exs. 1, 2, and 3.)  In early 2013, Merz

2   Pharma updated the Ethics Hotline, and added posters around the office and handed

3   out wallet cards, all with a goal of ensuring that employees are readily able to locate

4   the number to call if they have concerns about compliance with company policies.

5       Merz Pharma also requires all new employees and temporary workers to

6   review and sign its Confidential Information Policy (the "Policy").  (First

7   Alexander Decl. at ¶ 8; Exs. 8 and 9.)  The Policy makes abundantly clear that

8   employees are not permitted to bring to Merz Pharma and/or use any former's

9   employer's confidential information, instructs employees to contact the Ethics

10   Hotline with any concerns, and warns that violation of the Policy will result in

11   disciplinary action.  The Policy states:

12       1.   If I signed an agreement with any former employer or

13           principal regarding protection of that entity's confidential

14           business information, Merz expects and requires me to

15           honor that agreement.

16       2.   Regardless of whether I signed an agreement, under no

17           circumstances will I disclose to any Merz employee,

18           consultant, or representative any confidential business

19           information of my former employer or principal, and I

20           understand that no Merz employee, consultant, or

21           representative is permitted to ask me to do so.

22       3.   If I am asked by a Merz employee, consultant or

23           representative to provide information related to a former

24           employer or principal, and I am uncertain whether that

25           information is confidential business before disclosing the

26           information I will contact the Merz General Counsel, or the

27           Merz Chief Compliance Officer, or contact the Merz Ethics

28           Hotline…

4.   If I become aware of a violation of Merz's policy
     prohibiting the solicitation of or acceptance of confidential
     business information of any company that competes with
     Merz, I will contact the Merz General Counsel, the Merz
     Chief Compliance Officer, or the Merz Ethics Hotline.

5.   I understand that a violation of this policy will result in
     disciplinary action.

(*Id.*)  The Policy was implemented as part of Merz Pharma's efforts to deter employees from bringing confidential information to Merz Pharma and to detect possible policy violations.  (First Alexander Decl. at ¶ 8.)

Merz Pharma has also developed a Code of Conduct and Code of Ethics which again remind employees that they should not use trade secrets belonging to any former employer, and again instructs employees to contact the Corporate Compliance Office or Compliance Hotline if they have any concerns.  (*Id.* at ¶ 9; Exs. 10 and 11.)  All employees must also execute an Acknowledgement confirming that they have received and reviewed the Code of Ethics.  (*Id.*; Ex. 11.)

In addition, all employees receive, are provided time to review, and must attest to reviewing, Merz Pharma's Employee Handbook, which also contains Merz Pharma's Confidential Information Policy.  (*Id.* at ¶ 10; Ex. 12.)  In support of its ongoing efforts to deter and detect violations of its policies and procedures, Merz Pharma also sends all employees an annual email remainder concerning its Confidential Information Policy.  (*Id.* at ¶ 6; Ex. 5.)

The employee training guidelines detailed in the paragraphs above remain in effect as of the date this Second Status Report is filed.  (Declaration of Wendy Alexander in Support of Second Status Reported Regarding Corporate Compliance Program at ¶¶ 4-5.)

**Harmonization of Policies by Aesthetics and Merz Pharma.**

In late 2012, Merz began the process of integrating all Merz Pharma and

- 16 -

1   Aesthetics employees into one company.  Although the corporate structure has not

2   yet been finalized, some of the pieces have begun to be implemented.  For example,

3   Merz created the role of Vice President, Commercial Excellence, which now has

4   responsibility for onboarding, and training, all new hires at both companies to

5   ensure consistent messages and training.  Over the coming months, Merz will

6   continue to harmonize its hiring practices and written policies, with the goal of a

7   fully integrated workforce (including single policies shared by both companies)

8   during calendar year 2013.  Although the timing is not certain, the process of

9   harmonizing policies (including updating the Employee Handbook to create a

10  single document that will govern all Merz U.S. employees, IT/computer policies,

11  and Code of Conduct) has begun in the form of interdisciplinary teams meeting to

12  update existing policies and procedures.   (Declaration of Wendy Alexander in

13  Support of Second Status Reported Regarding Corporate Compliance Program at ¶

14  5.)

15  **B.    AESTHETICS PROTOCOL**

16          **1.    Compliance For Applicants and New Employees**

17          Aesthetics has used various processes to reinforce its efforts to deter

18  applicants from bringing and/or using confidential, proprietary, and trade secret

19  information from former employers to Aesthetics.

20          **Interviewing and Hiring.**

21          Aesthetics' commitment to deter these activities begins even before an

22  applicant is interviewed.  Any individual involved in interviewing and/or hiring an

23  applicant is provided a memorandum outlining Guidelines Regarding Recruiting

24  Without Obtaining, Using or Requiring Disclosure of Confidential or Trade Secret

25  Information.  (First Kappie Decl. at ¶ 4; Ex. 2.)

26          Further, in 2012, Aesthetics revised its employment application in support of

27  its efforts to deter applicants from bringing and/or using confidential, proprietary

28  and trade secret information from any former employer to Aesthetics.  (*Id.* at ¶ 7.)

1    In addition to including information about Aesthetics' Confidential Information

2    Policy, the employment application requires an applicant to agree that he or she

3    will:

4                    [N]ot bring onto the premises of Merz Aesthetics or

5                    transfer onto Merz Aesthetics' technology systems any

6                    unpublished document, proprietary information, or trade

7                    secrets belonging to any former or concurrent employer,

8                    person or entity, unless consented to in writing by both

9                    Merz Aesthetics and such former or concurrent employer.

10    (*Id.*; Ex. 6.)

11        In 2012, Aesthetics also developed a memorandum that is given to all

12    applicants before they are even permitted to interview.  Applicants are required to

13    review the memorandum setting forth the Confidentiality Expectations for All

14    Aesthetics Employees.  (*Id.* at ¶ 8; Ex. 7.)  The memorandum cautions that

15    Aesthetics does not want employees to bring any third-party's confidential

16    information with them to Aesthetics, and explains that Aesthetics' Confidential

17    Information Policy requires employees to "confirm that they have carefully

18    searched all personal electronic devices and returned all property and confidential

19    information belonging to prior employers." (*Id.*)  Applicants are not permitted to

20    begin working at Aesthetics unless and until they sign and agree to be bound by the

21    terms of the memorandum.  (Id at ¶ 8.)

22        If Aesthetics decides to extend an offer to a particular applicant, the applicant

23    is mailed an offer letter and declaration ("Standard Offer Letter and Standard

24    Declaration").  (Id. at ¶ 9; Ex. 8.)  The Standard Offer Letter makes abundantly

25    clear that Aesthetics employees are strictly prohibited from bringing any

26    proprietary or confidential business information of any former employer with them

27    to Aesthetics:

28                    Your offer is contingent upon your representation and

1        agreement that your employment with the Company will

2        not breach any agreement to keep in confidence

3        proprietary information, knowledge or data acquired by

4        you in confidence or in trust prior to becoming an

5        employee of the Company, and you will not use or

6        disclose to the Company, or induce the Company to use

7        or disclose, any confidential or proprietary information or

8        material belonging to any previous employer or others,

9        unless consented to in writing by such prior employer,

10      person or entity and the Company.  Your offer is also

11      contingent upon your further agreement to not bring onto

12      the premises of the Company any documents or any

13      property belonging to any former employer or other

14      person to whom you have an obligation of confidentiality,

15      unless consented to in writing by such prior employer,

16      person or entity and the Company.

17  (*Id.*)  Further, under the terms of the Standard Declaration, the applicant must

18  conduct a diligent search of all his or her electronic devices and remove any and all

19  documents belonging to any former employer before he or she can begin work at

20  Aesthetics. (*Id.*)  No applicant is permitted to start work at Aesthetics unless and

21  until he or she executes and returns the Standard Offer Letter and Standard

22  Declaration. (*Id.* at ¶ 9.)  Aesthetics has had a similar process in place for nearly a

23  year, but the Standard Offer Letter and Standard Declaration were strengthened in

24  2012 as a further effort to deter applicants from bringing and/or using confidential,

25  proprietary and trade secret information from former employers to Aesthetics.  (*Id.*)

26        In addition, from November 2011 through December 31, 2012, an applicant

27  who indicated on his or her application or resume that he or she had been employed

28  by an employer that Aesthetics has identified as a competitor ("Selected Former

1   Employer"), such as Allergan, was informed that any offer of employment at

2   Aesthetics was conditioned on the applicant's agreement to submit any and all

3   personal computer(s), iPad or tablet(s), iPhone or other smart phone(s), backup

4   drives or storage devices of any kind, CDs, DVDs, thumb drives, and web-based

5   storage to be reviewed by a third-party forensic expert, who searches for and

6   deletes all information related to any Selected Former Employer (the "Scrubbing

7   Process").[4]   (Id at ¶ 10.)  The applicant would need to allow the third-party forensic

8   expert to review his or her email accounts, and to search for and delete any

9   information contained in those accounts related to any Selected Former Employer.

10  (*Id.*)  If the applicant did not agree to participate in the Scrubbing Process,

11  Aesthetics would not consider him or her for employment.  (*Id.*)  While Aesthetics

12  has had a Scrubbing Process in place for more than a year, the process was

13  enhanced in 2012 as part of Aesthetics' further efforts to deter and detect any

14  violation of its policies.  (*Id.*)  The Scrubbing process was discontinued in 2013,

15  however, due to the enactment effective January 1, 2013, of California AB 1844.

16  (Declaration of Michelle Kappie Declaration In Support of Second Status Report

17  Regarding Corporate Compliance Program at ¶¶ 5-6.)

18        During the period the Scrubbing process was in effect, if Aesthetics decided

19  to extend an offer to an applicant who indicated that he or she had been employed

20  by a Selected Former Employer, the applicant was mailed an offer letter and

21  declaration ("Scrubbing Offer Letter and Scrubbing Declaration").  (First Kappie

22  Decl. at ¶ 11.)  In addition to the information and attestations contained in the

23  Standard Offer Letter and Standard Declaration, the Scrubbing Offer Letter and

24  Scrubbing Declaration made clear that the offer of employment was conditioned on

25  the applicant's agreement to undergo the Scrubbing Process, including the deletion

26

---

27  [4] Currently pending applicable state and/or federal legislation may limit
    Aesthetics' ability to require that an applicant agree to the Scrubbing Process.  In
28  the event that such legislation is enacted, Aesthetics will revise its protocol to
    comply with the law as needed.

1    of any and all documents containing the confidential, proprietary or trade secret

2    information of a Selected Former Employer.  The applicant was required to sign

3    both the Scrubbing Offer and Scrubbing Declaration.  (*Id.*)

4         Except as it related to the Scrubbing policy, the interview and hiring

5    guidelines detailed in the paragraphs above remain in effect remain in effect as of

6    the date this Second Status Report is filed.  (Declaration of Michelle Kappie

7    Declaration In Support of Second Status Report Regarding Corporate Compliance

8    Program at ¶¶ 4-6.)

9         **New Hire Training.**

10        All new employees (regardless of whether the employee was previously

11   employed by a Selected Former Employer) must also undergo training regarding

12   Aesthetics' Confidential Information Policy.  (First Kappie Decl. at ¶ 12; Ex. 3.)

13   As part of Aesthetics' extensive efforts to detect violations of its policies and

14   procedures, the training was enhanced in 2012 and now instructs employees to

15   contact Aesthetics' compliance line if they have any concerns.  (*Id.*)  Each new

16   employee must sign a Training Acknowledgment, certifying both that he or she has

17   completed the training, and acknowledging understanding of Aesthetics'

18   Confidentiality Policy.  (*Id.* at ¶ 12; Ex. 4.)

19        In addition to undergoing this training, each new employee is required to

20   review and sign the At Will Employment, Confidential Information, Inventions

21   Assignment Agreement ("Employment Agreement").  (*Id.* at ¶ 13; Ex. 10.)

22   Although language concerning the prohibition on bringing confidential, proprietary,

23   or trade secret information belonging to third-parties has been included in the

24   Employment Agreement for more than three (3) years, the Employment Agreement

25   was enhanced in 2012 in a further effort to deter employees from bringing this sort

26   of information to Aesthetics and to detect possible policy violations.  (*Id.* at ¶ 13.)

27   As currently written, the Employment Agreement not only binds employees to

28   agree "not [to] bring onto the premises of the Company or transfer onto the

1  Company's technology systems any unpublished document, proprietary
2  information, or trade secrets belonging to any such employer, person, or entity," but
3  requires every employee to:

4        [I]mmediately inform the Company's Legal Department
5        in the event I believe (i) my engagement with the
6        Company would make it difficult to maintain the
7        confidentiality of any such employer, person, or entity's
8        proprietary information or trade secrets; (ii) any Company
9        employee asks me to use or disclose or induce the
10       Company to use any proprietary information or trade
11       secrets of any of my former or concurrent employers or
12       other person or entity (other than Merz), without written
13       consent by such employer, person or entity and Merz.

14  (*Id.* at ¶ 14; Ex. 10.)

15       Last, every new employee is required to review and attest to reviewing
16  Aesthetics' Employee Handbook, which includes Aesthetics' Confidential
17  Information Policy. (*Id.*; Ex. 11.)  The Confidential Information Policy reminds
18  employees to contact the Aesthetics compliance line if they have concerns. (*Id.*)
19  The Confidential Information Policy has been in place for more than four years, but
20  was enhanced in 2012 as part of Aesthetics' efforts to deter and detect violations of
21  its policies and procedures. (*Id.* at ¶ 14.)

22       The new hire policies detailed in the paragraphs above remain in effect as of
23  the date this Second Status Report is filed. (Declaration of Michelle Kappie
24  Declaration In Support of Second Status Report Regarding Corporate Compliance
25  Program at ¶¶ 4-6.)

26

27

28

**2.**   <u>**Compliance For Current Employees, Temporary Employees**</u>
<u>**and Consultants**</u>

Aesthetics' protocol also focuses on additional training and emphasis of its
policies for current employees, temporary employees, and consultants.  Aesthetics
updated this training in 2012 and specifically directs employees to contact the
Aesthetics compliance line if they have any concerns.  Every employee must also
sign a Training Acknowledgment, certifying both that he or she has completed the
training and acknowledging understanding of Aesthetics' Confidential Information
Policy.  (First Kappie Decl. at ¶ 5.)

In support of its ongoing efforts to deter and detect violations of its policies
and procedures, Aesthetics also sends all employees an annual email reminder
concerning its Confidential Information Policy, attaching a copy of the Policy.
(First Kappie Decl. at ¶ 6; Ex. 5.)  Both the email and the attached Policy remind
employees to contact the Aesthetics compliance line if they have any concerns.
Merz plans to continue to send out periodic reminders such as this to all employees
in the future.  (Declaration of Michelle Kappie In Support of Second Status Report
Regarding Corporate Compliance Program at ¶¶ 4-6.)

Aesthetics' protocol includes steps designed to ensure that temporary
employees and consultants, like regular employees and applicants, do not use or
disclose confidential information belonging to third-parties.  As soon as they begin
working for Aesthetics, temporary employees must sign a Confidential Information
Agreement, which binds temporary employees to refrain from using, disclosing, or
inducing Aesthetics to use, any proprietary or confidential information belonging to
another business or entity, and to:

> [I]mmediately inform the Company's Legal Department
> in the event I believe (i) my engagement with the
> Company would make it difficult to maintain the
> confidentiality of any such employer, person or entity's

1          proprietary information or trade secrets; (ii) any Company

2          employee asks me to use or disclose or induce the

3          Company to use any proprietary information or trade

4          secrets of any of my former or concurrent employers or

5          other person or entity (other than Merz), without written

6          consent by such employer, person or entity and Merz.

7    (First Kappie Decl. at ¶ 15; Ex. 12.)  Like new and regular employees, temporary

8    employees are also required to complete Aesthetics' Confidential Information

9    Policy training every year, and to acknowledge that they have done so.  (*Id.* at ¶

10   15.)  Further, temporary employees receive the same annual email reminder sent to

11   regular employees concerning Aesthetics' Confidential Information Policy.  (*Id.*;

12   Ex. 5.)

13          Any Consultant or independent contractor retained by Aesthetics is required

14   to sign a Consultant Agreement, which sets forth Aesthetics' policy regarding

15   Confidential Information.  (*Id.* at ¶ 16; Ex. 13.)  Further, any service provider who

16   works for a Consultant or independent contractor must also sign a confidentiality

17   agreement, which prohibits the use or disclosure of third party confidential

18   information at Aesthetics.  (*Id.*)  Both this confidentiality agreement and the

19   Consultant Agreement were enhanced in 2012 as part of Aesthetics' ongoing efforts

20   to deter violations of its policies and procedures.  (*Id.* at ¶ 16.)

21          The training policies detailed in the paragraphs above remain in effect as of

22   the date this Second Status Report is filed.  (Declaration of Michelle Kappie

23   Declaration In Support of Second Status Report Regarding Corporate Compliance

24   Program at ¶¶ 4-6.)

25   / / /

26   / / /

27   / / /

28   / / /

1

## V.    **CONCLUSION**

2        Since the issuance of the Injunction, Merz has made the implementation and

3 continuation of corporate compliance programs designed to ensure compliance with

4 the Injunction a key priority.  Moreover, as evidenced by this Report, Merz has

5 fully complied with the terms of the Injunction.

6

Dated: March 8, 2013                     JONES DAY

7

8
                                         By: */s/ Steven M. Zadravecz*
9                                             Steven M. Zadravecz

10                                        Attorneys for Defendant and
                                         Counterclaimants
11                                        MERZ PHARMACEUTICALS, LLC
                                         AND MERZ AESTHETICS, INC.
12

13    IRI-48808v1

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND STATUS REPORT REGARDING
                                         CORPORATE COMPLIANCE PROGRAM
                                         SACV 11-499 AG (Ex)

**<u>CERTIFICATE OF SERVICE</u>**

I, Cindy D. Gonzales, declare:

I am a citizen of the United States and employed in Orange County, California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 3161 Michelson Drive, Suite 800, Irvine, California 92612.4408. On March 8, 2013, I served a copy of the <u>SECOND STATUS REPORT REGARDING CORPORATE COMPLIANCE PROGRAM</u> by electronic transmission.

I am familiar with the United States District Court, Central District of California's practice for collecting and processing electronic filings. Under that practice, documents are electronically filed with the court. The court's CM/ECF system will generate a Notice of Electronic Filing (NEF) to the filing party, the assigned judge, and any registered users in the case. The NEF will constitute service of the document. Registration as a CM/ECF user constitutes consent to electronic service through the court's transmission facilities. Under said practice, the following CM/ECF users were served:

> Brian Neach
> O'Melveny & Myers LLP
> 610 Newport Center Drive, 17th Fl.
> Newport Beach, CA 92660
> Phone: 949-823-6900; Fax: 949-823-6994
>
> *Attorneys for Plaintiffs/Counterdefendants*
> Allergan, Inc.

CERTIFICATE OF SERVICE

1    Executed on March 8, 2013, at Irvine, California.

2

3                                    /s/ Cindy D. Gonzales

4                                    Cindy D. Gonzales

IRI-48815v1

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

CERTIFICATE OF SERVICE